**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
148 West 24th Street, 8th Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiff,*
*FLSA Collective Plaintiffs,*
*and the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

EFE SONGUN, *on behalf of himself, FLSA Collective*
*Plaintiffs, and the Class,*

                        Plaintiff,

        v.

PIER SIXTY LLC
        d/b/a PIER 60,
        d/b/a THE LIGHTHOUSE,
        d/b/a CURRENT, and
PAUL GALLEN,

                    Defendants.

Case No:

**CLASS AND COLLECTIVE**
**ACTION COMPLAINT**

---

Plaintiff EFE SONGUN ("Plaintiff"), on behalf of himself and others similarly situated, by

and through his undersigned attorneys, hereby files this Class and Collective Action Complaint

against Defendants, PIER SIXTY LLC d/b/a PIER 60, d/b/a THE LIGHTHOUSE, d/b/a

CURRENT (the "Corporate Defendant"), and PAUL GALLEN (the "Individual Defendant" and

collectively with the Corporate Defendant, the "Defendants") and states as follows:

## INTRODUCTION

1.      Plaintiff alleges, pursuant to the Fair Labor Standards Act, as amended, 29 U.S.C. §§ 201 *et. seq.* ("FLSA"), that he and similarly situated individuals are entitled to recover from Defendants: (1) unpaid wages, due to time shaving, (2) unpaid wages, due to tip retention, (3) liquidated damages, and (4) attorneys' fees and costs.

2.      Plaintiff further alleges that, pursuant to the New York Labor Law ("NYLL"), he and similarly situated individuals are entitled to recover from Defendants: (1) unpaid wages, due to time shaving, (2) unpaid wages, due to tip retention, (3) unpaid wages, due to a failure to reimburse uniform expenses, including uniform maintenance expenses, (4) liquidated damages, (5) statutory penalties due to WTPA violations, and (6) attorneys' fees and costs.

3.      Plaintiff further alleges on an individual basis that, pursuant to the New York State Human Rights Law § 296 ("NYSHRL"), Plaintiff was deprived of his statutory rights due to Defendants' discrimination based on Plaintiff's sexual orientation. Plaintiff seeks to recover from Defendants: (1) economic damages, (2) compensatory damages, (3) punitive damages, (4) damages for egregious emotional distress, and (5) attorneys' fees and costs.

4.      Plaintiff further alleges on an individual basis that, pursuant to the New York City Human Rights Law, Administrative Code of the City of New York § 8-107 ("NYCHRL"), Plaintiff was deprived of his statutory rights due to Defendants' discrimination based on Plaintiff's sexual orientation. Plaintiff seeks to recover from Defendants: (1) economic damages, (2) compensatory damages, (3) punitive damages, (4) damages for egregious emotional distress, and (5) attorneys' fees and costs.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this controversy pursuant to 29 U.S.C. §216(b), 28 U.S.C. §§1331, 1337 and 1343, and has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

6.      Venue is proper in the Southern District pursuant to 28 U.S.C. §1391.

## PARTIES

7.      Plaintiff SONGUN, for all relevant time periods, was a resident of Kings County, New York.

8.      Corporate Defendant PIER SIXTY LLC d/b/a PIER 60 d/b/a THE LIGHTHOUSE d/b/a THE CURRENT is a domestic limited liability company organized under the laws of the State of New York, with a principal place of business located at Pier 60 Chelsea Piers, New York, NY 10011. Corporate Defendant PIER SIXTY LLC does business as an event venue, hosting weddings, bar and bat mitzvahs, fundraising benefit galas, holiday parties, and proms. Corporate Defendant PIER SIXTY LLC owns and operates the following venues together as "The Pier Sixty Collection":

(i)      Pier Sixty – Pier 60 Chelsea Piers, New York, NY 10011;

(ii)     The Lighthouse – Pier 61 Chelsea Piers, New York, NY 10011; and

(iii)    Current – Pier 59 Chelsea Piers, New York, NY 10011.

(together, "the Locations" or "The Pier Sixty Collection")

9.      The Locations are all operated under the common control of Defendants with a common Payroll Department and centralized Human Resources Department, which sets and administers all pay and company policies. Specifically, the Locations are engaged in related activities, share common ownership, and have a common business purpose.

(a) The Locations are advertised together as "The Pier Sixty Collection" on Defendants' website. Moreover, Defendants' website illustrates that the Locations are all located in the same premises. *See* **Exhibit A.**

(b) The New York State Liquor Authority Mapping Project ("LAMP") lists Corporate Defendant PIER SIXTY LLC as the holder of all three (3) Locations' liquor licenses. Moreover, all three (3) liquor licenses list the same principals. *See* **Exhibit B.**

(c) Individual Defendant PAUL GALLEN is listed as the president of The Pier Sixty Collection on LinkedIn, Corporate Defendant PIER SIXTY LLC's website, newspaper articles, and podcast episodes. *See* **Exhibit C.**

(d) Moreover, a previous class and collective action lawsuit against The Pier Sixty Collection states that Corporate Defendant PIER SIXTY LLC and Individual Defendant PAUL GALLEN own and operate all Locations. *See* **Exhibit D.** *See also Shahani v. Pier Sixty LLC et al,* 1:24-cv-06211-PAE (S.D.N.Y.), at Dkt. No. 1.

(e) Additionally, in 2012, prior to the opening of Corporate Defendant PIER SIXTY LLC's "Current" Location, Corporate Defendant PIER SIXTY LLC was involved in another class and collective action lawsuit which settled on a class-wide basis. In this matter, the Court granted the plaintiffs' motion for class certification and included employees from both "The Lighthouse" and "Pier 60" in the class definition. *See* **Exhibit E.** *See also Spicer et al v. Pier Sixty LLC et al,* 1:08-cv-10240-PAE-FM (S.D.N.Y.), at Dkt. No. 56.

(f) All Locations have a centralized Human Resources Department and Administration Department that deals with hiring, firing, and administering all the Locations' workforce. For example, Plaintiff, FLSA Collective Plaintiffs, and the Class were all supervised and trained by the same managers. Moreover, Corporate Defendant PIER SIXTY

LLC's website contains a page titled "Careers", which lists job openings for all Locations. This page also includes a job description for a "Stewarding Manager" position, which alludes to Defendants' policy of hiring, training, and supervising employees across all Locations. *See* **Exhibit F.**

(g) At all relevant times, Defendants maintained a policy and practice in which employees' scheduled workweeks routinely included shifts at multiple locations. On most weeks Plaintiff worked, Plaintiff was scheduled to work shifts at all Locations: Pier 60, The Lighthouse, and Current. Moreover, around three (3) times a week, Plaintiff was scheduled to work at two (2) or more locations in one day.

(h) At all relevant times, Defendants have maintained a policy and practice in which employees were required to transfer supplies between Locations. For example, Plaintiff was required to transfer bar equipment and decorations between Locations several times a week. Moreover, multiple job openings posted by Defendants state that transferring supplies between event venues is an essential duty and responsibility for Defendants' employees. *See* **Exhibit G.**

(i) All Locations have the same vendors, including payroll providers, audio providers, video providers, lighting providers, and produce suppliers.

- Regardless of how many Locations he worked at on any given workweek, all of Plaintiff's paychecks were issued by Corporate Defendant PIER SIXTY LLC, from Pier 60's address. *See* **Exhibit H.**

- Corporate Defendant PIER SIXTY LLC partners with its exclusive in-house partner, KVL Audio Visual & Lighting, which provides audio, visual, and lighting services for all three (3) Locations. *See* **Exhibit I.**

- The Locations all offer the same menus, as advertised on Corporate Defendant's website. *See* **Exhibit J.**

(j) The Locations are all advertised together on social media as "The Pier Sixty Collection". *See* **Exhibit K.**

10. Individual Defendant PAUL GALLEN is the President of Corporate Defendant PIER SIXTY LLC. Individual Defendant PAUL GALLEN exercises operational control as it relates to all employees including Plaintiff, FLSA Collective Plaintiffs, and the Class. At all relevant times, Individual Defendant PAUL GALLEN—by himself or through managerial staff—exercised the power to fire and hire employees, supervise and control employee work schedules and conditions of employment, and determine the rate and method of compensation of employees including those of Plaintiff, FLSA Collective Plaintiffs, and Class Members. By himself or through managerial staff, Individual Defendant PAUL GALLEN would have the authority to effect any changes to the quality and terms of employees' employments, including changing their schedules, compensation, or terminating or hiring such employees. At all relevant times, Individual Defendant PAUL GALLEN exercised functional control over Corporate Defendant's business and its financial operations.

11. At all relevant times, Corporate Defendant PIER SIXTY LLC was and continues to be an "enterprise engaged in commerce" within the meaning of the FLSA and the NYLL.

12. At all relevant times, the work performed by Plaintiff, FLSA Collective Plaintiffs, and Class Members was directly essential to the business operated by Defendants.

## FLSA COLLECTIVE ACTION ALLEGATIONS

13. Plaintiff brings claims for relief as a collective action pursuant to FLSA Section 16(b), 29 U.S.C. § 216(b), on behalf of all front-of-house and back-of-house employees, including but not limited to cooks, food preparers, dishwashers, housemen, cleaning staff, hosts, servers,

waiters, bartenders, bussers, and runners, among others, employed by Defendants on or after the date that is six years before the filing of the Complaint in this case as defined herein (herein, "FLSA Collective Plaintiffs").

14.     At all relevant times, Plaintiff and the other FLSA Collective Plaintiffs are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendants' decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in a willful failure and refusal to pay Plaintiff and FLSA Collective Plaintiffs their proper wages, including overtime, due to Defendants' time shaving.  Moreover, Plaintiff brings claims as to tipped FLSA Collective Plaintiffs as Defendants improperly retained gratuities.

15.     The claims for relief are properly brought under and maintained as an opt-in collective action pursuant to § 16(b) of the FLSA, 29 U.S.C. 216(b). The FLSA Collective Plaintiffs are readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided to FLSA Collective Plaintiffs via first class mail to the last address known to Defendants.

## RULE 23 CLASS ALLEGATIONS

16.     Plaintiff brings claims for relief pursuant to the Federal Rules of Civil Procedure ("F.R.C.P.") Rule 23, on behalf of all front-of-house and back-of-house employees, including but not limited to cooks, food preparers, dishwashers, housemen, cleaning staff, hosts, servers, waiters, bartenders, bussers, and runners, among others, employed by Defendants on or after the date that is six years and 228 days (pursuant to New York's tolling during the COVID-19 pandemic) before the filing of the Complaint in this case as defined herein (the "Class" or "Class Members").

17.     The Class Members are readily ascertainable. The number and identity of the Class Members are determinable from the records of Defendants. The hours assigned and worked, the position held, and rates of pay for each Class Member may also be determinable from Defendants' records. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided by means permissible under F.R.C.P. 23.

18.     The proposed Class is so numerous such that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. Although the precise number of such persons is unknown because the facts on which the calculation of that number rests presently within the sole control of Defendants, there is no doubt that there are more than forty (40) members of the Class. The Class further includes a subclass of tipped employees ("Tipped Subclass") subject to Defendants' policies of tip retention, who also number more than forty (40). Plaintiff is a member of both the Class and the Tipped Subclass.

19.     Plaintiff's claims are typical of those claims that could be alleged by any member of the Class, and the relief sought is typical of the relief, that would be sought by each member of the Class in separate actions. All the Class Members were subjected to the same corporate practices by Defendants, as alleged herein, of (i) failing to pay wages for all hours worked, including overtime hours, due to Defendants' illegal time shaving, and (ii) failing to reimburse uniform expenses, including uniform maintenance expenses incurred by Plaintiff and the Class.

20.     With regard to Plaintiff and the Tipped Subclass, they are also subject to the same corporate practices of Defendants, as alleged herein, of unlawful tip retention, in violation of the FLSA and the NYLL. Plaintiff and the Tipped Subclass suffered from Defendants' tip retention

policies, because Defendants withheld significant amounts of gratuities from their wages while falsely informing customers that their tips were properly given to tipped staff.

21.    Plaintiff is both able to fairly and adequately protect the interests of the Class and has no interests antagonistic to the Class. Plaintiff is represented by attorneys who are experienced and competent in both class action litigation and employment litigation and have previously represented plaintiffs in wage and hour cases.

22.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy – particularly in the context of the wage and hour litigation where individual class members lack the financial resources to vigorously prosecute a lawsuit against corporate defendants. Class action treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender. Because losses, injuries and damages suffered by each of the individual Class Members are small in the sense pertinent to a class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Class Members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the claims as a class action would result in a significant saving of these costs. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendants and resulting in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided

by means of common, class-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

23.    Defendants and other employers throughout the state violate the New York Labor Law. Current employees are often afraid to assert their rights out of fear of direct or indirect retaliation. Former employees are fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class actions provide class members who are not named in the Complaint a degree of anonymity, which allows for the vindication of their rights while eliminating or reducing these risks.

24.    There are questions of law and fact common to the Class which predominate over any questions affecting only individual class members, including:

a) Whether Defendants employed Plaintiff and the Class within the meaning of the New York Labor Law;

b) What are and were the policies, practices, programs, procedures, protocols and plans of Defendants regarding the types of work and labor for which Defendants did not pay Plaintiff and Class Members properly;

c) What are and were the policies, practices, programs, procedures, protocols, and plans of Defendants regarding hiring and terminating Plaintiff and Class Members;

d) At what common rate, or rates subject to common methods of calculation, was and are Defendants required to pay Plaintiff and Class Members for their work;

e) Whether Defendants paid Plaintiff and Class Members overtime premiums at one-and-one half times their regular hourly rate for all hours worked in excess of forty (40) each workweek;

f) Whether Defendants operated their business with a policy of failing to pay Plaintiff and Class Members for all hours worked, including overtime, due to a policy of time shaving,

g) Whether Defendants accurately tracked the amounts of tips earned by Plaintiff and the Tipped Subclass each day and maintained records thereof;

h) Whether Defendants illegally retained gratuities earned by Plaintiff and the Tipped Subclass;

i)   Whether Defendants failed to reimburse uniform expenses, including uniform maintenance expenses, as required by NYLL;

j)   Whether Defendants provided Plaintiff and Class Members with proper wage and hour notices, at their dates of hiring and annually, per requirements of the New York Labor Law; and

k)   Whether Defendants provided Plaintiff and Class Members with proper wage statements with each payment of wages, as required by New York Labor Law.

## **STATEMENT OF FACTS**

25.     In or around April 2023, Plaintiff SONGUN was hired by Defendants to work as a Banquet Server at Defendants' "The Pier Sixty Collection". Plaintiff's employment with Defendants lasted until June 2025, when Plaintiff was constructively terminated due to Defendants' time shaving, tip retention, and discrimination against him which made continued employment impossible.

26.     Throughout Plaintiff's employment, Plaintiff worked at the following Locations:

(a)   Pier Sixty – Pier 60 Chelsea Piers, New York, NY 10011;

(b)   The Lighthouse – Pier 61 Chelsea Piers, New York, NY 10011; and

(c)   Current – Pier 59 Chelsea Piers, New York, NY 10011.

27.     Plaintiff's schedule varied depending on  events scheduled at the various locations of Defendants' events. On any given workweek, Plaintiff worked at all three (3) Locations. For up to three (3) of these shifts, Plaintiff worked at multiple locations in a single day. At all relevant times, Plaintiff, FLSA Collective Plaintiffs, and Class Members were similarly scheduled to work at multiple locations during any given workweek.

28.     Plaintiff's hours varied depending on the frequency of Defendants' events. Throughout his employment, Plaintiff was typically scheduled to work fifty-five (55) hours per week on average. However, during peak business periods, Plaintiff worked over seventy (70) hours

per week. Plaintiff worked approximately six (6) days per week, with each shift lasting fourteen (14) to eighteen (18) hours.

29.    As an example, Plaintiff was compensated as working fifty-eight and one-half (58.5) hours for the week ending on May 18, 2025. However, due to Defendants' time shaving policy, Plaintiff worked in excess of his compensated hours, and this excess time went unpaid.

*Unpaid Wages, Due to Time Shaving*

30.    Plaintiff, FLSA Collective Plaintiffs, and Class Members were not compensated for all hours worked, due to Defendants' unlawful time shaving policy.

31.    Defendants tracked employees' hours through a system in which Plaintiff, FLSA Collective Plaintiffs, and Class Members were prohibited from clocking in and out themselves. Instead, Defendants required employees to look for their managers who would then manually clock in all employees.  Because managers were hard to find and busy, employees would be shorted an average of fifteen (15) minutes daily, trying to locate the manager on duty when they arrived at work.  Defendants' managers were not readily available to clock employees in at the beginning of their shifts because they may not even be on the floor, dealing with administration issues, vendors, or other customer concerns.  As a result, Plaintiff, FLSA Collective Plaintiffs, and Class Members worked approximately fifteen (15) minutes off the clock on daily.

32.    Approximately, three (3) times per week, Plaintiff was scheduled to work at multiple locations in one day. During these shifts, after an event ended, Defendants required Plaintiff to transport supplies with him to the next event venue he was scheduled to work at. However, Plaintiff was never compensated for the time he spent transporting said supplies. At all relevant times, FLSA Collective Plaintiffs and Class Members were similarly required to transport

supplies between the event locations they were scheduled to work at, and did not receive compensation for their travel time.

33.     Defendants maintained a policy and practice in which Plaintiff, FLSA Collective Plaintiffs, and Class Members were required to notify management when they left their first event venue, and when they arrived at their next scheduled event location. Defendants implemented this policy to deduct employees' travel time from their wages, despite requiring said employees to work as they traveled. Transporting supplies in between locations took approximately ten (10) minutes. As a result, Plaintiff, FLSA Collective Plaintiffs, and Class Members were time shaved approximately thirty (30) minutes transporting supplies each week.

34.     Defendants failed to have Plaintiff, FLSA Collective Plaintiffs or Class Members clock-in-or-out for any meal breaks. Despite not having employees track their meal break hours, Defendants automatically deducted thirty (30) minutes from employee's pay checks for each day worked. This deduction occurred despite employees either having their meal break interrupted or being unable to take a meal break at all.  Plaintiff's meal breaks were either interrupted or did not occur at all approximately three (3) to four (4) times per week.

35.     At all relevant times, FLSA Collective Plaintiffs and Class Members were similarly subjected to the same time shaving policies and required by Defendants to engage in unpaid labor on a daily basis without any compensation.

*Unpaid Wages due to Tip Retention*

36.     At all relevant times, Defendants failed to pay all tips owed to Plaintiff, FLSA Collective Plaintiffs, and Tipped Subclass Members, in violation of the FLSA and NYLL.

37.     At all relevant times, Defendants hosted private events at the Locations. During these events, Defendants' clients left tips for the employees who provided them service. However,

Plaintiff, FLSA Collective Plaintiffs, and Tipped Subclass Members did not receive proper amounts of tips from the events they worked, because Defendants retained large sums of these tips for themselves. As a result, Plaintiff's, FLSA Collective Plaintiffs', and Tipped Subclass Members' wages were reduced further.

38.     Defendants' private events generally cost thousands—or tens of thousands—of dollars. Despite this exorbitant pricing, which would surely yield large amounts of tips for Plaintiff due to the common technique of percentage-based tipping (commonly amount 20%), Plaintiff's tips on his paycheck did not reflect said pricing. For example, by the week of June 15, 2025, Plaintiff worked for at least hours 690.90 hours during the year of 2025. However, he only received $396.17 in tips throughout the entirety of 2025. *See* **Exhibit H.** Defendants held a minimum of nine (9) private events per week, and on most weeks, Plaintiff was scheduled to work for at least nine (9) of these events. At all relevant times, FLSA Collective Plaintiffs and Tipped Subclass Members worked a similar number of events each week.

39.     Additionally, Plaintiff was routinely required to work longer shifts based on the number of events which were scheduled each week. Nonetheless, the amount of tips he received for working more events and extended hours was grossly disproportionate to the hours he worked, raising serious concerns regarding the allocation of tips from these events.

40.     At all relevant times, Defendants intentionally obfuscated all data regarding these retained tips from Plaintiff, FLSA Collective Plaintiffs, and the Tipped Subclass. Defendants never provided them with any information concerning their tip earnings from private events, including any tip sheets, tip earning logs, tip distribution logs, billing statements, gratuity disclosures, or agreements.

41.    Moreover, during many of these events, Plaintiff witnessed customers hand to management envelopes filled with cash gratuities. While doing so, the customers told Plaintiff's managers, "Give this to all servers." However, Plaintiff, FLSA Collective Plaintiffs, and Tipped Subclass Members were deprived of these gratuities, due to tip retention.

42.    At all relevant times, Plaintiff's, FLSA Collective Plaintiffs', and Tipped Subclass Members' tips and gratuities were covered under the meaning of § 196-d of the NYLL. In New York, "[n]o employer or his agent or an officer or agent of any corporation, or any other person shall demand or accept, directly or indirectly, any part of the gratuities and other surcharges or fees, received by an employee, or retain any part of a gratuity or of any charge purported to be a gratuity for an employee." § NYLL 196-d.

43.    Further, Defendants failed to provide customers with an explicit written statement that all tips, surcharges, service fees, and gratuities left would be retained by Defendants. Defendants' failure to provide notice of their retention of tips from tipped employees was inadequate to satisfy the requirements of *Sarmiento v. World Yacht Inc.*, 10 N.Y.3d 70 (2008).

44.    Even if customers were provided with a written statement that any surcharges, service fees, etc. were not tips, it is clear that customers would still have understood these fees to be tips.  It is an ordinary and typical practice for customers to leave tips to the employees working at a private event.  Despite this ordinary and typical practice and despite working dozens of events, Plaintiff never received tips for his service.  Clearly any written statement, if provided, that surcharges or service fees were not tips, failed to adequately inform the customers that these fees were being assessed for purposes of providing additional compensation to employees.

45.     At all relevant times, Defendants knowingly and willfully operated their business with a policy of retaining Plaintiff's, FLSA Collective Plaintiffs', and tipped Subclass Members' tips, in violation of the FLSA and the NYLL.

*Unpaid Uniform and Uniform Maintenance Expenses*

46.     At all relevant times, Defendants failed to reimburse Plaintiff's and Class Members' uniform expenses, in violation of the NYLL.

47.     Defendants required Plaintiff to wear black dress pants, a black dress shirt, and a blazer. However, Defendants never reimbursed Plaintiff for his expenses incurred in maintaining and cleaning his uniform, and as a result, Defendants improperly reduced Plaintiff's pay. Similarly, Defendants required Class Members to maintain and wash their uniforms without reimbursement.

48.     Further, Defendants failed to furnish uniforms to Plaintiff and Class Members in sufficient number consistent with the average number of days worked per week as required by 12 NYCRR § 146-1.7, forcing Plaintiff and Class Members to spend time off-the-clock caring and cleaning for the uniforms they had.

49.     Defendants knowingly and willfully operated their business with a policy of not reimbursing Plaintiff's and Class Members' uniform expenses, in violation of the NYLL.

*Violations Under the WTPA*

50.     At all relevant times, Plaintiff and Class Members never received a proper wage notice from Defendants. They also did not receive accurate wage statements from Defendants.

51.     In violation of the Wage Theft Protection Act ("WTPA")—incorporated into NYLL—Defendants knowingly and willfully operated their business with a policy of not providing wage notices to Plaintiff and Class Members at the beginning of their employment with Defendants.

52.     Defendants further violated the WTPA by failing to provide Plaintiff and Class Members with accurate wage statements, because wage statements that do not reflect the actual number of hours worked by the employee do not satisfy the requirements of the WTPA. *See Shi Yong Li v. 6688 Corp.,* 2013 U.S. Dist. LEXIS 148020, at \*6 (S.D.N.Y. Sept. 27, 2013) ("The wage statements provided failed to accurately indicate the amount of time actually worked by tipped employees") (emphasis added); *Copper v. Cavalry Staffing, LLC*, 132 F. Supp. 3d 460, 468 (E.D.N.Y. 2015) (holding that "the 'number of overtime hours' that appears on the wage statement should include every hour actually 'worked' by the employee") (emphasis added); *Campos v. Bkuk 3 Corp.*, 2021 U.S. Dist. LEXIS 151528, at \*30 (S.D.N.Y. Aug. 10, 2021) ("Thus, when paystubs were received, they were not accurate insofar as they did not accurately reflect the hours actually worked") (emphasis added).

53.     In failing to provide proper wage statements and notices, Defendants have failed to comply with the law in a manner that entails a concrete harm to an interest identified by the New York State legislature. As one Court observed:

> Here, Plaintiffs allege that Defendants failed to furnish them with proper wage notices and statements, as required by NYLL §§ 195(1) and 195(3). These provisions were enacted as part of New York's Wage Theft Prevention Act ("WTPA"), N.Y. Lab. Law § 195, which sought "to expand the rights of employees to seek civil and criminal avenues of remedy for their employers failing to follow labor law appropriately and the specifications therein." N.Y. Spons. Mem., 2010 S.B. 8380. More specifically, the New York State Assembly passed the WTPA to address studies showing that a large number of employees were not being paid the wages owed to them, and that many employers were not adequately informing their employees of their wages and how they are calculated in language the employees could understand. *Id.* The New York State Assembly opined that existing penalties did not adequately deter employers from paying less than the wages owed, and stated that the WTPA would dramatically change this by increasing penalties for violating employees' rights. *Id.*

*Imbarrato v. Banta Mgmt. Servs*., 2020 U.S. Dist. LEXIS 49740, at \*21-22 (S.D.N.Y. March 20, 2020)

54.     Here, Defendants' failure goes beyond generating a risk of harm to Plaintiff and Class Members. Defendants' conduct actually harmed Plaintiff and Class Members. Defendants' failure to provide wage notices and paystubs listing all hours actually worked and rates of pay, including overtime hours and overtime rates, deprived employees of the ability to contest the pay provided by Defendants, allowed Defendants to hide their wrong-doing, and necessitated the current litigation to vindicate Plaintiff's and Class Members' rights. This conduct ensured Defendants' ability to further delay providing proper compensation to low wage earners entitled to protection under federal and state law. Defendants' failure to provide wage notices and wage statements to employees allowed Defendants to hide their responsibility and deprive employees of timely compensation.

55.     Had the wage statements Defendants provided to Plaintiff and Class Members accurately listed the total number of hours Plaintiff and Class Members actually worked, as required by law, Defendants would have had to either (a) increase the wages to correspond to the hours actually worked or (b) forthrightly acknowledge, by way of the wage statement, that the employee's wages did *not* correspond to the hours the employee actually worked. Either possibility would have allowed Plaintiff and Class Members to vindicate their rights under the NYLL. The deprivation of these possibilities therefore constitutes an injury.

56.     The failure to provide proper wage notices and wage statements continues to result in delayed payment of all proper wages owed to Plaintiff and Class Members. This delayed payment caused Plaintiff and Class Members to struggle to pay bills and other debts.

57.     Defendants knowingly and willfully operated their business with a policy of not providing proper wage notices and wage statements as required by NYLL.

58.     The direct effect of understating the number of hours an employee worked is to reduce the wages that employees are listed as having earned on their wage statements. The direct effect of this, in turn, is to reduce the employee earnings that the employer later reports to the IRS through the employee's W-2 form, as such information is derived from the information on employees' wage statements. *See Mills v. Mills*, 2021 Minn. Dist. LEXIS 200, at *5 (Minn. Dist. Ct., Anoka County, Tenth Judicial District May 20, 2021) ("Petitioner's gross annual income, based on her 2020 W-21 and paystub dated 12/24/20, is $130,321.30"); *T.F. v. N.F.*, 820 N.Y.S.2d 846, 846 (Sup. Ct., Suffolk Cty., June 22, 2006) ("In 2005 the plaintiff earned $ 133,086 as reflected on his final year paystub and W-2").[1]

59.     The effect of reporting reduced wages on an employees' W-2 is, in turn, to reduce the amount of social security benefits available to the employee, as an employee's entitlement to benefits reflects how much money he or she is reported as having contributed to the social security system. *See McGauran v. Soc. Sec. Comm'n*, 2001 U.S. Dist. LEXIS 3187, at *7 (N.D. Cal. March 19, 2001) ("Social security benefits are based upon the worker's earnings as reported to the [SSA] . . . [and] the worker's earnings are used to determine insured status for entitlement to retirement and to calculate cash benefit rates." (quoting Social Security Administration, Handbook § 1400 (1997)); *Coward v. Zurich Am. Ins. Co.*, 2011 U.S. Dist. LEXIS 74543, at *3 (N.D. Ill. July 8,

---

[1] It is true that the wages reported on W-2 forms are not always precisely identical to those listed on an employees' last paystub for the year. One reason for is, as the IRS explains, that "W-2 wages include: (i) the total amount of wages as defined in section 3401(a); (ii) the total amount of elective deferrals (within the meaning of section 402(g)(3)); (iii) the compensation deferred under section 457; and (iv) the amount of designated Roth contributions (as defined in section 402A)." https://www.irs.gov/pub/irs-drop/rp-19-11.pdf. However, the possibility, that wages listed on a W-2 might be affected by such considerations does not change the fact that the base wages on the W-2 are derived from paystubs. The paystub processing service *realcheckstubs* explains: "A pay stub contains crucial information that assists in calculating W2 wages. Paystub provides gross wages, deductions, taxes withheld, and other income-related data. Individuals gather the necessary figures required for accurate W2 calculation by referring to the pay stub." https://www.realcheckstubs.com/blog/paystubs/6-steps-how-to-calculate-w-2-wages-from-paystub.

2011) ("Under the Social Security statute, entitlement depends on 'the total of the wages paid . . . to an individual in a calendar year.'") (quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

60.    "In the wake of the Supreme Court's decision in *TransUnion*, courts in this Circuit have held that plaintiffs lack standing to bring wage notice and statement claims under the NYLL absent any concrete, downstream consequences of the recordkeeping violation." *Chen v. Lilis 200 W. 57th Corp.*, 2023 U.S. Dist. LEXIS 38163, at *18 (S.D.N.Y. Mar. 7, 2023). "On the other hand, 'allegations' that go 'beyond asserting a bare statutory violation and sufficiently allege concrete harm' resulting from 'the underpayment of wages' pass muster because 'monetary injury is a concrete harm sufficient for purposes of Article III standing.'" *Thompson v. Elev8 Ctr. N.Y., LLC*, 2023 U.S. Dist. LEXIS 122504, at *21 (S.D.N.Y. July 17, 2023) (quoting *Mateer v. Peloton Interactive, Inc.*, 2022 U.S. Dist. LEXIS 125017, at *4 (S.D.N.Y. July 14, 2022)).

61.    Here, it is clear that Defendants' failure to provide Plaintiff and Class Members with accurate wage statements entailed "concrete, downstream consequences" involving monetary injury. Had the number of hours been accurately reported for a given pay period, Defendant's automatic payroll system would have correspondingly increased the wages due for that period, which in turn would have been reflected in the W-2s that Defendants submitted to the IRS on behalf of Plaintiff and Class Members. That, in turn, would have increased Plaintiff's and Class Members' entitlement to social security benefits. Because the inaccuracy prevented this outcome, it constitutes an injury sufficient to provide Plaintiff with Article III standing.

62.    Courts agree that the misreporting of wages constitutes a concrete injury cognizable under Article III:

> The Seventh Circuit in *Calderon* squarely addressed FICA standing. The plaintiffs in *Calderon* were former employees alleging the employer failed to pay their FICA taxes. 999 F.2d at 1105-06. The Seventh Circuit found that the plaintiffs lacked standing to compel the employer to pay their FICA taxes because

"[b]enefits do not. . . depend on whether the employer actually paid the taxes." *Id*. at 1106. Plaintiffs could, however, enforce FICA's reporting requirement because it is the reporting of income that triggers benefits, and losing benefits is an injury under *Lujan*. *Id*. Whether the employer in *Calderon* made FICA payments on the plaintiffs' behalf had no bearing on the plaintiffs' entitlement to benefits. *Id*. "[T]he plaintiff's real interest lies in ensuring that the [employer] make the proper reports of their income." *Id*.

*Coward*, 2011 U.S. Dist. LEXIS 74543, at *3-4.

63.     The case at bar is somewhat different from *Coward* inasmuch as Defendants actually underpaid Plaintiff and other employees rather than merely misreporting their income. But this distinction has no bearing on the question of Article III standing, since it is still the case that "it is the reporting of income that triggers benefits, and losing benefits is an injury." *Id*. Plaintiff and Class Members lost benefits by virtue of how Defendants reported their income, and how Defendants reported employees' income was the direct outcome of the inaccuracies in employees' wage statements. That is why "Plaintiffs have standing to enforce the statutory reporting requirements" imposed by the WTPA. *Calderon v. Witvoet*, 999 F.2d 1101, 1106 (7th Cir. 1993).

64.     Whether or not any Class Members are presently eligible for social security benefits is legally immaterial. *See id*. ("Although only citizens and aliens residing in the United States may receive benefits, 42 U.S.C. § 402(t), plaintiffs may eventually fulfill this requirement and therefore are entitled to keep their Social Security accounts accurate.").

65.     The *Calderon* court stressed that an employee's interest in ensuring that an employer properly report the employee's income is amplified by the difficulty of persuading the government to correct errors:

The practical difficulty is that eligibility for Social Security benefits presumptively depends on reports that employers send to the government. A worker who seeks credit for unreported income bears the burden of proof, 42 U.S.C. § 405(c)(3), (4), which will be hard to carry if the employer has not furnished the customary

documentation. The government believes employers who report earnings, because these reports are costly to make--they entail paying a substantial tax. The government tends not to believe undocumented claims by employees, because these claims are essentially costless yet could establish entitlement to large pensions or disability benefits.

All of this means that the plaintiffs' real interest lies in ensuring that the Witvoets make the proper reports of their income.

*Id.*

66. Here, the problem is not merely challenging but insurmountable. Plaintiff and Class members cannot even attempt to have their earnings report corrected because Defendants *did* report what they actually paid Plaintiff and Class Members. The problem, rather, is that Plaintiff and Class Members were underpaid. Yet the ultimate effect is the same—reduced social security eligibility. Because "[u]nder the Social Security statute, entitlement depends on 'the total of the wages paid . . . to an individual in a calendar year,'" Plaintiff was irreversibly injured with respect to his social security benefits as soon as Defendants sent his W-2 to the IRS. *Coward*, 2011 U.S. Dist. LEXIS 74543, at *3 (N.D. Ill. July 8, 2011) (quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

67. Defendants knowingly and willfully operated their business with a policy of failing to provide Plaintiff and Class Members with wage notices and accurate wage statements, in violation of the NYLL.

*Plaintiff's Individual Discrimination Claims*

68. Throughout his employment, Plaintiff suffered from Defendants' unlawful discrimination based on his sexual orientation, in violation of the NYSHRL and NYCHRL. Plaintiff faced a loss of wages, and extreme physical and emotional distress as an outcome of the discrimination he was subjected to at Defendants' place of employment.

69. Plaintiff is a gay man.

70.     At all relevant times, Plaintiff was harassed verbally and discriminated against by Defendants' managers, who targeted him due to his sexual orientation.

71.     For example, during an event Defendants hosted for an LGBTQ magazine, Plaintiff's supervisor remarked, "Oh it's you, once the banquet director leaves we won't be having these kind of events here anymore, and you can go with them."

72.     Throughout his employment with Defendants, Plaintiff applied for several promotions. Plaintiff witnessed his heterosexual coworkers receive offers for these promotions, despite these coworkers having disproportionately less experience and seniority than him. Given Plaintiff's background and record of performance, these promotions constituted a deliberate and discriminatory bypassing of a qualified, experienced gay man in favor of several underqualified straight employees, in violation of the NYSHRL and NYCHRL.

73.     Plaintiff complained to management about discrimination. However, management made no attempt to rectify the discriminatory acts, nor did they attempt to provide any type of accommodation to Plaintiff. Soon after, Defendants coordinated a meeting with their Human Resources representative and two of Defendants' managers. During the meeting, in response to Plaintiff's complaints, the managers told Plaintiff that they would "look into it", but no further action was taken.

74.     As a result of Defendants' discriminatory conduct in violation of the NYSHRL and NYCHRL, Plaintiff suffered from emotional distress, stress, and depression.  Plaintiff left Defendants employment to escape the discrimination, which Defendants' management failed to address or correct.

75.     Plaintiff retained Lee Litigation Group, PLLC to represent Plaintiff, FLSA Collective Plaintiffs, and the Class in this litigation, and has agreed to pay the firm a reasonable fee for its services.

## STATEMENT OF CLAIM

## COUNT I

## VIOLATION OF THE FAIR LABOR STANDARDS ACT

76.     Plaintiff realleges and incorporates all the above allegations of this Complaint as fully set forth herein.

77.     At all relevant times, Defendants were and continue to be employers engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a). Further, Plaintiff and FLSA Collective Plaintiffs are covered individuals within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207 (a).

78.     At all relevant times, Defendants employed Plaintiff and FLSA Collective Plaintiffs within the meaning of the FLSA.

79.     At all relevant times, Corporate Defendant had gross annual revenues in excess of $500,000.

80.     At all relevant times, Defendants had a policy and practice that failed to pay Plaintiff and FLSA Collective Plaintiffs wages for all hours worked, due to time shaving.

81.     At all relevant times, Defendants had a policy and practice that failed to pay Plaintiff and FLSA Collective Plaintiffs their proper wages, due to Defendants' illegal tip retention policy.

82.     Records, if any, concerning the number of hours worked by Plaintiff and FLSA Collective Plaintiffs and the actual compensation (including tips) paid to Plaintiff and FLSA

Collective Plaintiffs should be in the possession and custody of the Defendants. Plaintiff intends to obtain these records by appropriate discovery proceedings to be taken promptly in this case and, if necessary, will then seek leave of Court to amend this Complaint to set forth the precise amount due.

83.     Defendants knew of and/or showed a willful disregard for the provisions of the FLSA as evidenced by their failure to compensate Plaintiff and FLSA Collective Plaintiffs their proper wages, including their tips, when Defendants knew or should have known such was due.

84.     Defendants failed to properly disclose or apprise Plaintiff and FLSA Collective Plaintiffs of their rights under the FLSA.

85.     As a direct and proximate result of Defendants' willful disregard of the FLSA, Plaintiff and FLSA Collective Plaintiffs are entitled to liquidated (i.e., double) damages pursuant to the FLSA.

86.     Due to the intentional, willful and unlawful acts of Defendants, Plaintiff suffered damages in an amount not presently ascertainable of unpaid wages, unpaid gratuities, and liquidated damages.

87.     Plaintiff and FLSA Collective Plaintiffs are entitled to an award of their reasonable attorneys' fees and costs pursuant to 29 U.S.C. §216(b).

## COUNT II

### VIOLATION OF THE NEW YORK LABOR LAW
### ON BEHALF OF PLAINTIFFS AND CLASS MEMBERS

88.     Plaintiff realleges and incorporates all the above allegations of this Complaint as fully set forth herein.

89.     At all relevant times, Plaintiff and Class Members were employed by the Defendants within the meaning of the New York Labor Law, §§ 2 and 651.

90.     Defendants willfully violated Plaintiff's and Class Members' rights by failing to pay them for all hours worked, in violation of the New York Labor Law.

91.     Defendants willfully violated Plaintiff's and Tipped Subclass Members' rights by illegally retaining their rightfully earned gratuities.

92.     Defendants willfully violated Plaintiff's and Class Members' rights by failing to reimburse them for uniform expenses, including uniform maintenance expenses, in violation of the New York Labor Law.

93.     Defendants knowingly and willfully operated their business with a policy of not providing Plaintiff and Class Members with proper wage notices, at date of hiring and at dates of all wage changes thereafter, as required under NYLL.

94.     Defendants failed to provide Plaintiff and Class Members with proper wage statements with every payment as required by New York Labor Law § 195(3).

95.     Due to the Defendants' New York Labor Law violations, Plaintiff and Class Members are entitled to recover from Defendants their unpaid wages, illegally retained gratuities, reasonable attorneys' fees, liquidated damages, statutory penalties, and costs and disbursements of this action, pursuant to the New York Labor Law.

## COUNT III

### DISCRIMINATION UNDER THE
### NEW YORK STATE HUMAN RIGHTS LAW

**(N.Y. Exec. Law § 292, *et seq*.)**
**(brought on Plaintiff's behalf only)**

96.     Plaintiff realleges and incorporates all the above allegations as against all Defendants, as if fully set forth herein.

97.     The New York State Executive Law § 296(1)(a) provides that:

"It shall be an unlawful discriminatory practice: For an employer … because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

98.    Defendants violated the New York State Human Rights Law when they discriminated against Plaintiff on the basis of his sexual orientation. Plaintiff's manager and coworkers regularly subjected Plaintiff to this discrimination. At all relevant times, Defendants were aware of this discrimination and failed to take any disciplinary or accommodative action as a remedy.

99.    This discriminatory conduct was in willful disregard of the provisions of the NYSHRL.

100.    As a direct and proximate result of Defendants' willful disregard of the NYSHRL, Plaintiff suffered damages in the form of past and future emotional distress. Plaintiff seeks all applicable remedies under the law, including compensatory damages, punitive damages, and attorneys' fees and costs.

**COUNT IV**

**VIOLATIONS UNDER THE
NEW YORK CITY HUMAN RIGHTS LAW
(N.Y.C. Admin. Code § 8-101, *et seq.*)**

**(Brought Only on Plaintiff's Behalf)**

101.    Plaintiff realleges and incorporates all the above allegations as if fully set forth herein.

102.    The New York City Administrative Code §8-107(1)(a) provides that:

"1. It shall be an unlawful discriminatory practice:

(a) For an employer or an employee or agent thereof, because of the actual or perceived […]disability, […] of any person:

    (1) To represent that any employment or position is not available when in fact it is available;

    (2) To refuse to hire or employ or to bar or to discharge from employment such person; or

    (3) To discriminate against such person in compensation or in terms, conditions or privileges of employment."

103. Defendants violated the New York City Human Rights Law when they discriminated against Plaintiff on the basis of his sexual orientation. Defendants subjected Plaintiff to this discriminatory conduct through verbal harassment, sexual harassment, and physical intimidation. As a result of Defendants' discrimination, Plaintiff suffered from immense depression and stress.

104. This discriminatory conduct was in willful disregard of the provisions of the NYCHRL.

105. As a direct and proximate result of Defendants' willful disregard of the NYCHRL, Plaintiff suffered damages in the form of lost future earnings and emotional distress. Plaintiff seeks all applicable remedies under the law, including compensatory damages, punitive damages, damages for egregious emotional distress, and attorneys' fees and costs.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself, FLSA Collective Plaintiffs, and Class Members, respectfully request that this Court grant the following relief:

a. A declaratory judgment that the practices complained of herein are unlawful under the FLSA and the NYLL;

b.  An injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

c.  An award of unpaid wages due to time shaving, due under the FLSA and the NYLL;

d.  An award of disgorgement of all improperly distributed tips, due under the FLSA and the NYLL;

e.  An award of all applicable damages to Plaintiff for Defendants' discrimination under the NYSHRL and NYCHRL;

f.  An award of statutory penalties as a result of Defendants' failure to comply with New York Labor Law wage statement requirements;

g.  An award of liquidated and/or punitive damages as a result of Defendants' willful failure to pay wages pursuant to 29 U.S.C. § 216;

h.  An award of liquidated and/or punitive damages as a result of Defendants' willful failure to pay wages pursuant to the NYLL;

i.  An award of pre-judgment and post-judgment interests, costs, and expenses of this action together with reasonable attorneys' and experts' fees and statutory penalties;

j.  Designation of Plaintiff as Representative of the FLSA Collective Plaintiffs;

k.  Designation of this action as a class action pursuant to F.R.C.P. 23;

l.  Designation of Plaintiff as Representative of the Class, including the Tipped Subclass; and

m.  Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable as of right by jury.

Dated: December 18, 2025          Respectfully submitted,
       New York, New York

                                                  **LEE LITIGATION GROUP, PLLC**
                                                  C.K. Lee (CL 4086)
                                                  Anne Seelig (AS 3976)
                                                  148 West 24th Street, 8th Floor
                                                  New York, NY 10011
                                                  Tel.: 212-465-1188
                                                  Fax: 212-465-1181

                                                  *Attorneys for Plaintiff,*
                                                  *FLSA Collective Plaintiffs,*
                                                  *and the Class*

By:     */s/ C.K. Lee*
              C.K. Lee, Esq.